UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SANDRA HART, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:14-CV-00614 (VLB) |
| | : | |
| v. | : | |
| | : | |
| ESTUARY COUNCIL OF SENIORS, INC. | : | |
|     Defendants. | : | February 25, 2015 |

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #12]

I.   Introduction

The Plaintiff, Sandra Hart ("Hart"), brings this action against Estuary Council of Seniors, Inc. ("ECSI"), for disability discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA") Conn. Gen. Stat. § 46a-60, and in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, as a result of her termination from employment following disclosure of her breast cancer diagnosis. Currently pending before the Court is the Defendant's Motion for Summary Judgment [Dkt. 12]. For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED.

II.   Factual Background

ECSI is a Connecticut corporation which provides services to senior citizens residing in lower Middlesex County, CT. [Dkt. 1, Compl. ¶ 2]. In January of 2010, Plaintiff was hired by the Defendant as a fundraising consultant. [Dkt.

1

12-4, Ex. 2, Hart Dep. Tr. 32-33]. On or about May 3, 2010, the Plaintiff was hired by the Defendant to serve in a newly-created position as Development Director [Dkt. 12-2, Def.'s Rule 56(a)(1) Statement ¶ 1]. Plaintiff's primary duties were to raise funds for the Defendant through grant applications and fundraising drives and events. [Dkt. 15-5, Ex D].

The parties in this case have submitted testimony supporting two different versions of the events leading to Plaintiff's termination. Plaintiff's version of events begins in December of 2012, when Plaintiff was diagnosed with breast cancer and informed members of the Defendant's Board of Directors and the Executive Director Paula Ferrara. [Dkt. 12-2, Pl.'s Rule 56(a)(2) Statement ¶ 3]. Plaintiff claims that after she informed the Defendant regarding her diagnosis, she noticed a change in the attitude of several coworkers, describing them as "cold." [Id]. Plaintiff testified at her deposition that she planned to continue working, but planned to take off one half-day every two weeks for her chemotherapy treatment. [Dkt. 12-4, Ex. 2, Hart Dep. Tr. 144-146].

Plaintiff alleges that the Defendant's Controller, Stan Mingione, delayed or withheld payment of Defendant's group health insurance premiums, which resulted in Plaintiff receiving letters threatening termination of coverage. [Dkt. 15-3, Ex. B, Hart Aff. ¶ 11]. Plaintiff admits that such premiums were eventually paid, but testified that the termination letters caused her "great distress." [Id. ¶ 13]. Plaintiff also describes Mingione as "harassing and bullying," but has not asserted any facts to support her characterization. [Id.].

2

Plaintiff hand-delivered a letter to Ferrara on February 18, 2013 which discussed her concerns regarding the group health insurance premiums and her deteriorating relationship with Mingione. [Id. ¶ 14]. In that letter, Plaintiff complained about Mingione's "personal attitude toward me since my very first day here," which date necessarily predated her cancer diagnosis and disclosure of her diagnosis to the Defendant. [Dkt. 12-11, Ex. 9, Letter dated February 18, 2013 at 3]. Plaintiff's letter also stated that "resolution to these issues is critical to my health, my job performance and the smooth running of the office." [Id.].

Plaintiff claims that two days after she wrote that letter, on February 20, 2013, after her first chemotherapy treatment, she eavesdropped on Mingione's end of a telephone conversation. Plaintiff claims that Ferrara was on the other end of the conversation, although she admits that she could not hear the other participant. [Dkt. 12-4, Ex. 2, Hart Dep. Tr. 144-149]. Plaintiff claims that Mingione was discussing Plaintiffs employment and "strategies for getting rid of her" and that she heard Mingione utter something along the lines of "she's milking it" and that this comment was in reference to her disability. [Id. 149:19-24]. Plaintiff's employment was terminated two days later on February 22, 2013. [Dkt. 15-3, Ex. B, Hart Aff. ¶ 16].

Defendant's version of the events surrounding Plaintiff's termination, however, begins in January of 2013, when Defendant's Finance Committee held a meeting noting an $11,000 decline in fundraising and an overall program deficit of $65,000. [Dkt. 12-6, Ex. 4, Minutes of Finance Committee Meeting dated January 16, 2013]. Thereafter, Defendant's Treasurer, Bob Ford, recommended to its

3

Board of Directors that "people fasten their seatbelts as they are in for a rough ride" and that the corporation take a "good strong look" at where cuts could be made to the staff, as personnel costs were exceeding the budgeted amount by $10,000.  [Dkt. 12-7, Ex. 5, Minutes of Board of Directors Meeting dated January 28, 2013].  The Board was informed that two personnel positions had already been recently eliminated.  [Id.].  The minutes of that Board meeting reveal that Ford asked Ferrara "about a specific staff position-the one specifically responsible for fundraising," referring to Plaintiff's position.  [Id. at 3].  According to the minutes:

> "[Ford] indicated that he recognized that there is a difference between running a nonprofit and a company with a number of profit centers. He suggested that the position responsible for fundraising, along with probably others, is not so difficult to measure, in terms of performance. He indicated that the loaded salary of the incumbent should be offset by the monies brought in to the organization, year after year. And if that isn't the case, there is a problem.
>
> Ms. Ferrara indicated that the position is measured. A discussion followed regarding the position and the measurements. [Ferrara] requested strict confidence be maintained, and asked that nothing be shared with anybody. Personnel issues are not for discussion at the Board meetings. The only reason information was provided is because it was in response to a question asked by a board member.  [Ferrara] asked again that everyone please not share any of this with anybody as it is a personnel issue."
>
> [Id. at 3-4].

At the next Finance Committee meeting on February 20, 2013, Ford emphasized that "[t]he Estuary is at a critical junction financially."  [Dkt. 12-8, Ex. 6, Minutes of Finance Committee Meeting dated February 20, 2013].  Mingione stated that Defendant's deficit projection had risen to $109,000 and was due to

4

"unfunded positions and programs losing money." [Id. at 2]. Mingione also stated:

> "Fundraising has to cover expenses including salaries and benefits. If we don't cover that, we are on the losing side. Five years ago, fundraising was at +$21,000. Last year, it was at -$3,000. That's a problem."

[Id.]. One month after Plaintiff's termination, the Defendant's Board of Directors met again on March 25, 2013 and the first item discussed was Plaintiff's termination. The minutes for that meeting provide:

> President, Connie Cliffe reported that the Executive Committee met twice since the last Board of Directors meeting. The first meeting, February 22, 2013 was held regarding the dire straits of the budget, and led to the decision to eliminate the position of the Development Director. [Treasurer Ford] provided the financial background supporting the decision. [Ford] reported that the budget shortfall is growing on a monthly basis and the numbers in the financial reports speak for themselves. A $200,000 deficit at year end was projected if no change in course was made.
>
> Questions were posed by numerous Board members. Answers were given and much discussion followed. Vice President, Lyn Posner brought the discussion back to topic by emphasizing that the decision made by the Executive Committee was not about who, it was about what could be done to sustain the organization [. . .] [a] suggestion was made that a letter be written from the Board of Directors, thanking Sandy Hart for her contribution to the organization.
>
> [Dkt. 12-9, Ex. 7, Minutes of Board of Directors Meeting dated March 25, 2013].

In support of its Motion for Summary Judgment, Mingione submitted an affidavit stating that "the decision to terminate the newly created full time position of Development Director was based solely on financial considerations and the fact that the Estuary Council was not meeting its budget goals and was running a substantial deficit." [Dkt. 12-5, Ex. 3, Mingione Aff. ¶ 10]. Plaintiff, however, claims that Defendant's reasoning for her termination was pretextual.

5

Plaintiff alleges that she had received favorable reviews, and that there had been "no indication that ESCI was dissatisfied with her performance." [Dkt. 15-3, Ex. B, Hart Aff. ¶ 16]. Plaintiff also alleges that her fundraising efforts "generated substantially more income than it cost ECSI to employ her." [Dkt. 12-2, Pl.'s Rule 56(a)(2) Statement ¶ 5]. The Plaintiff does not allege how much she raised or how much it cost to employ her. Nor does the Plaintiff challenge Defendants' allegation that fundraising revenues were declining dramatically and that the organization was facing a mounting deficit.

Plaintiff filed complaints with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunities Commission (EEOC) alleging unlawful discrimination in the termination of her employment. Following the failure of mandatory mediation under the CHRO's procedures, Plaintiff requested and obtained a release of jurisdiction and "right to sue" letter from the CHRO. [Dkt. 1, Compl. ¶ 13].

Defendant has moved for summary judgment on all counts, arguing that that Plaintiff was terminated for the legitimate, non-discriminatory reason that the position was being eliminated to due to financial constraints and that Plaintiff has offered no evidence that this reasoning is pretextual.

### III.  Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of

**6**

proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record,

7

summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

IV. <u>Discussion</u>

Title I of the ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard[s] to" any employment decision.  42 U.S.C. § 12112(a).  A claim brought under the ADA follows the familiar burden-shifting framework of Title VII cases: "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir.2009) (*quoting Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.2006)).

"Connecticut courts generally analyze ADA and CFEPA claims under the same standard."  *Willoughby v. Conn. Container Corp.*, 11-cv-00992(CSH), 2013 WL 6198210, at *16 (D. Conn. Nov. 27, 2013) (citations and internal quotation marks omitted).  Accordingly, the Connecticut Supreme Court has noted that Connecticut state courts will "look to federal law for guidance on interpreting state employment discrimination law," as "the analysis is the same under both." *Craine v. Trinity College*, 259 Conn. 625, 637 n.6 (Conn. 2002)*.*

To establish a prima facie case of discrimination arising from adverse employment action under the ADA, a plaintiff must show "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or

8

perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." B*rady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).  Defendant did not argue in support of its Motion for Summary Judgment that Plaintiff has failed to establish a prima facie case.[1]  Thus, the burden shifts to the Defendant to offer a legitimate, non-discriminatory reason for Plaintiff's termination.

### a. *ECSI's Legitimate, Non-Discriminatory Reason for Plaintiff's Termination*

Defendant argues that the termination of Plaintiff's employment was solely "an attempt to address [ECSI's] financial problems."  Plaintiff's opposition to the Motion for Summary Judgment did not argue that Defendant's financial difficulties were not a legitimate reason for termination of Plaintiff's position.

---

[1] **Defendant did allege in its Reply Memorandum that Plaintiff had not met her burden of establishing a prima facie case and suggested that Plaintiff "cannot demonstrate" that she was either qualified for the position or was terminated because of her disability.  However, Local Rule 7(d) requires that Reply briefs "be strictly confined to a discussion of matters raised by the responsive brief."  *See* D. Conn. L. Civ. R. 7(d)A.  The Court will not consider this argument, as it is "impermissibly raised for the first time in defendant's reply brief," depriving Plaintiff of an opportunity to address the elements of its prima facie case, and "there is no reason why it could not have been raised in the initial motion." *Ferrante v. Capitol Reg'l Educ. Council*, No. 3:14-CV-00392-VLB, 2015 WL 1445206, at \*6 (D. Conn. Mar. 30, 2015).  More importantly, the argument was raised frivolously by counsel for the Defendant, without citation to any authority or to the Record.  Indeed, the entire six page Reply Memorandum – ostensibly a response to Plaintiff's Memorandum of Law opposing the Motion – is devoid of any citation to legal authority.  Defendant does not even attempt to convince the Court that Plaintiff – a professional fundraiser hired to assume a position as a director of development – was not qualified for a fundraising position.**

9

**Therefore the Court finds that Defendant has met its burden of proffering a legitimate, non-discriminatory purpose.**

### c. *Plaintiff's Evidence that ECSI's Proffered Reason for Terminating Her Employment is Pretext for Discrimination*

**With the Defendant having proffered a legitimate, non-discriminatory purpose, the "ultimate burden then rests with the plaintiff to persuade the fact finder that the employer's proffered explanation is merely a pretext for its intentional discrimination."** *Greenway v. Buffalo Hilton Hotel*, **143 F.3d 47, 52 (2d Cir.1998).**

**Plaintiff has cited four alleged facts in support of her argument that ESCI's reasoning for her termination is pretextual, including: (1) the temporal proximity between the disclosure of her cancer diagnosis and her termination, (2) the fact that the money Plaintiff was raising for ECSI "exceeded ECSI's cost to employer her," (3) the change in attitude exhibited by Cliffe and Neville, (4) the comments Plaintiff overheard Mingione make on the telephone, allegedly to Ferrara. [Pl.'s Opp. Mem. at 18-19]. The Court considers each in turn.**

**It is undisputed that Plaintiff's termination occurred just two months after disclosure of her cancer diagnosis and only four days after her delivery of a letter expressing concerns about Mingione's handling of the Defendant's group health insurance premiums. Temporal proximity alone, however, "is insufficient to defeat summary judgment at the pretext stage."** *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, **263 F.3d 208, 224 (2d Cir. 2001). The question is whether temporal**

proximity, taken together "with other evidence such as inconsistent employer explanations" can support an inference of pretext. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir.2013).

Here, the fact that Plaintiff may have been raising money "exeed[ing] ESCI's cost[s] to employ[]" Plaintiff does not render Defendant's explanation inconsistent. Plaintiff was a professional fundraiser hired for more than the simple purpose of bringing in enough funds to cover her own salary and benefits. The goal for Plaintiff's position was to bring in enough in *new* grants and donations – beyond those that the organization had previously been able to achieve without Plaintiff – as to justify the expense of the newly-created Development Director position. In other words, the goal was to well exceed ECSI's past fundraising efforts, prior to the creation of Plaintiff's full-time position. There is no evidence on the Record that Plaintiff did so.

Plaintiff argues that one appeal letter that she wrote "brought in over $44,000" whereas "such an appeal letter typically brought in $16,000 per year before Plaintiff's tenure as Development Director." [Ex. B, Hart Aff. ¶ 7]. Plaintiff also argues that proceeds from "new and innovative events . . . increased under Plaintiff's direction." [Id]. These allegations are episodic in nature and present no holistic picture of the alleged success of her fundraising efforts. Even viewed in the light most favorable to her, Plaintiff's proffered facts are simply not enough to render Defendant's explanation inconsistent or incredulous, because they do not offer evidence that Plaintiff's overall fundraising performance met or exceeded expectations such that a reasonable finder of fact could infer that

11

Defendant's explanation of financial difficulties was pretextual. On the contrary, the Record shows that Defendant's overall fundraising revenues were in decline.

The record further shows that the organization was forced to cut staff to stem a burgeoning deficit at the time Plaintiff's position and those of two other employees were eliminated. The cuts began in January of 2013, when Defendant's Finance Committee held a meeting noting an $11,000 decline in fundraising and an overall program deficit of $65,000. [Dkt. 12-6, Ex. 4, Minutes of Finance Committee Meeting dated January 16, 2013]. Thereafter, Defendant's Treasurer, Bob Ford, recommended to its Board of Directors that "people fasten their seatbelts as they are in for a rough ride" and that the corporation take a "good strong look" at where cuts could be made to the staff, as personnel costs were exceeding the budgeted amount by $10,000. [Dkt. 12-7, Ex. 5, Minutes of Board of Directors Meeting dated January 28, 2013]. The Board was informed that two personnel positions had already been recently eliminated. [Id.]. Two days before Plaintiff was terminated, minutes from the meeting of Defendant's Finance Committee noted that "[f]ive years ago, fundraising was at +$21,000" and that "[l]ast year, it was at -$3,000" and stated "[t]hat's a problem." [Dkt. 12-8, Ex. 6, Minutes of Finance Committee Meeting dated February 20, 2013]. At that meeting, Ford emphasized that "[t]he Estuary is at a critical junction financially." [Id.]. Mingione stated that Defendant's deficit projection had risen to $109,000 and was due to "unfunded positions and programs losing money." [Id. at 2]. Mingione also stated: "Fundraising has to cover expenses including salaries and

benefits.  If we don't cover that, we are on the losing side."  [Id.].  Plaintiff offers no facts to refute these objective statements and conclusions.

Plaintiff had the opportunity during discovery to build a record in support of her argument that ESCI's reasoning was pretextual, which could have been done in several ways.  First, Plaintiff could have shown that her fundraising was at least in line with expectations, or that the organization's budget woes were not as dire as Defendant claims, or that the organization could have reduced expenses in ways that would have made more sense than cutting her position.  Plaintiff failed to build any such record, and in so failing has submitted no evidence to dispute the Defendant's portrait of an organization in significant financial distress which was forced to lay off several employees, including but not limited to Plaintiff, at the beginning of 2013.

Even if Plaintiff had established an inference that Defendant's explanation is pretextual, she has not established an inference that the true motivation behind her termination was discriminatory intent.  The allegation that other employees – whom Defendant names as Connie Cliffe and Mike Neville – became "cold" and "strictly business-like" after Plaintiff disclosed her diagnosis, fails to support any evidence of discriminatory intent.[2]

The same is true regarding the comment allegedly uttered by Mingione that "she's milking it," even accepting as true Plaintiffs interpretation of this utterance as a comment to Ferrara in a telephone conversation (which Plaintiff did not hear)

---

[2] Plaintiff has cited no authority for the proposition that the ADA requires supervisory employees to be 'warm' or to be more than "strictly business-like" to those who are disabled within the meaning of the Act, or that a failure to be sufficiently friendly can support an inference of discriminatory animus.

13

about the Plaintiff.  Although Plaintiff is correct that "[s]tatements by an employer which mention the employee's disability" can in some circumstances constitute evidence of pretext, *see Primmer v. CBS Studios, Inc.*, 667 F. Supp.2d 248 (S.D.N.Y. Sept. 8, 2009), the Record does not establish that Mingione was commenting on her disability rather than his belief that she was malingering. Further the Plaintiff offers no evidence that Mingione was responsible for, or even involved in, the decision of the Executive Committee which led to her termination. "An employer's intent to discriminate must be evaluated by reference to the decision-maker actually ordering the adverse employment action."  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 130, 137 (2d Cir. 2005).  The Record shows that Plaintiff's position was eliminated as a result of a vote of Defendant's Executive Committee, and Plaintiff has not offered evidence that the members of this committee were either motivated by discriminatory animus or manipulated by specific employees motivated by discriminatory animus.[3]

Plaintiff argues, citing Plaintiff's letter concerning Mingione's handling of the Defendant's insurance premiums, that "Defendant fired Plaintiff because Defendant perceived her as a potentially needy employee, who would likely

---

[3] Plaintiff has also failed to submit any evidence which might support a "cat's paw" theory of discrimination, in which "a non-decisionmaker with a discriminatory motive dupes an innocent decisionmaker into taking action against the plaintiff."  *Saviano v. Town of Westport*, No. 3:04-CV-522 RNC, 2011 WL 4561184, at *7 (D. Conn. Sept. 30, 2011).  A "central principle" behind "cat's paw liability" is the delegation of decision-making or fact-finding power to a biased supervisor, who then influences the decision-maker.  *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 152 (D. Conn. 2012), *citing Staub v. Proctor Hosp.*, 562 U.S. 411, 420-421 (2011).  Even if Plaintiff had submitted evidence indicating that Mingione was biased, no such delegation occurred here and there is no evidence that the Executive Committee relied upon anything other than its own independent review of the facts and circumstances.

14

require accommodations due to physically taxing chemotherapy treatments."[4] Again, however, the mere fact that Mingione may have made untimely premium payments for Defendant's group insurance plan does not support an inference that the committee which decided to eliminate Plaintiff's position was motivated by an intent to discriminate against Plaintiff on the basis of her breast cancer diagnosis. The Plaintiff cites to no evidence to even support her conclusion that that Mingione had a nefarious purpose in failing to pay the group healthcare premium timely. In the absence of such evidence, Plaintiff offers only conjecture which is insufficient to defeat summary judgment.

Finally, even as to Mingione – the one employee against whom Plaintiff has presented any plausible evidence of discriminatory intent, Plaintiff's own letter notes a perception of hostility originating on Plaintiff's *first day* of employment, well before her eventual diagnosis of breast cancer. "A plaintiff must at least produce some definite facts that a jury could infer discrimination from." *Johnson v. C. White & Son, Inc.*, 772 F.Supp.2d 408, 416 (D.Conn. 2011). Plaintiff here has failed to do so.

V.  **Conclusion**

In conclusion, Plaintiff has failed to produce evidence from which a reasonable juror could conclude that Defendant's proffered explanation for Plaintiff's termination was pretextual and that the explanation was pretext for intentional discrimination on the basis of Plaintiff's disability. Defendant's

---

[4] The allegation that Mingione believed that the Plaintiff would need time off because her treatments were taxing is inconsistent with Plaintiff's assertion that Mingione complained that she was milking her cancer diagnosis, which implies that he believed she was receiving more concessions than she needed.

Motion for Summary Judgment is therefore GRANTED.  The Clerk is directed to enter judgment in favor of Estuary Council Of Seniors, Inc. and to close this case.

                                        IT IS SO ORDERED.


                                        _____/s/_____
                                        Hon. Vanessa L. Bryant
                                        United States District Judge

Dated at Hartford, Connecticut: February 25, 2015